**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| LATOYA LASHAY FLUDD, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SOUTH STATE BANK, and DOES 1-100,<br><br>Defendant. | Civil Action No.:  2:20-cv-1959-BHH |

## CLASS ACTION COMPLAINT

Plaintiff Latoya Lashay Fludd ("Plaintiff"), by her attorneys, hereby brings this class and representative action against South State Bank and DOES 1 through 100 (collectively "South State" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      Plaintiff has brought this class and representative action to assert claims in her own right, and as the class representative of all other persons similarly situated.  Defendant wrongfully and without authorization, unilaterally and without warning, withdrew money from Plaintiff and the Class Members' checking accounts when it was not authorized by contract or

1

equities to do so.  Defendant falsely claimed that the funds it unilaterally took from Plaintiff's account were properly assessed Non-Sufficient Funds ("NSF") fees (a fee for a transaction that was returned unpaid) or overdraft fees (a fee for a transaction item that was advanced and paid by Defendant on behalf of Plaintiff).  However, Defendant was only authorized to assess one fee per transaction item and instead assessed multiple NSF fees for the same item, or an NSF fee followed by an overdraft fee on the same item in violation of its contracts and disclosures with Plaintiff and the putative class.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Defendant's policy and practice of unlawfully assessing and unilaterally collecting NSF fees as set forth herein, in violation of its contract(s) with Plaintiff and the class and equities.

## PARTIES

4.     Plaintiff Latoya Lashay Fludd is a resident of Ladson, South Carolina, and a customer of Defendant at all relevant times.

5.     Based on information and belief, Defendant is a subsidiary of South State Corporation, doing business as South State Bank, with its headquarters located in Columbia, South Carolina.

6.     Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations.  As used herein, where appropriate, the term "Defendant" is also inclusive of defendants DOES 1 through 100.

7.     Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or the Court.

8.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate

individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

9.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendant.

13.    Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b),  because Defendant entered into its contract with Plaintiff in this District; Defendant is headquartered in this District; Defendant breached its contract in this district; Defendant regularly conducts business in this District; and because a substantial part of the events or

omissions giving rise to the claims asserted herein occurred in this District.  Venue is proper in this division because Plaintiff resides in the division; Plaintiff's account is held in this division; and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this division.

## BACKGROUND

## DEFENDANT SOUTH STATE BANK

14.     According to its website, Defendant is a bank with locations and customers in over 100 cities in four states including South Carolina, North Carolina, Georgia, and Virginia. As of December 31, 2019, according to its financial filings, it reported having 2,546 full-time employees and holdings over $15.7 billion in assets.

## CHECKING ACCOUNTS DEFENDANT OFFERS TO CUSTOMERS

15.     One of the main services Defendant offers to its customers is a checking account where consumers can deposit and withdraw their money.  The checking account can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at the branch; and deposits at ATM machines.  Debits decreasing the amount in the checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases.  Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.  Defendant is compensated for maintaining the checking account by earning interest on the money deposited by customers and then lent to other customers or parties and charging fees on the account.  Defendant is only allowed to charge and assess fees that are authorized by contract.  As of December 31, 2019, Defendant reported holding 719,882 non-retirement deposit accounts (which include checking accounts) with a total balance of $11,861,979,000.

**CHECKING ACCOUNT OVERDRAFT AND NSF FEES GENERATE SIGNIFICANT
PROFIT FOR THE DEFENDANT**

16.     In connection with its processing of debit transactions (debit card, ATM, check,
ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an
overdrawn item) or NSF fees (a fee for return of an item due to an overdrawn account) to
customer accounts when it claims to have determined that an account has been overdrawn.  In
2019, Defendant reported collecting $30,924,000 in consumer overdraft-related service charges
on accounts intended primarily for individuals with personal, household or family use.  Based on
information and belief, a significant portion of those service charges consist of overdraft fees or
NSF fees Defendant collects from a relatively small percentage of the bank's customers.

**THE DETRIMENTAL EFFECT OF OVERDRAFT AND NSF FEES**

17.     This case is about when and under what circumstances Defendant may charge an
overdraft and/or NSF fee.

18.     The underlying principle for charging overdraft fees is that when the bank pays a
transaction by advancing the bank's own funds instead of using a customer's insufficient funds,
it may charge a *contracted* fee, provided that charging the fee is not prohibited by some legal
regulation. This fee constitutes very expensive credit. According to the FDIC:

> For almost all study population banks operating an automated
> overdraft program, the main fee associated with the program was
> an NSF usage fee. Usage fees reported by these banks ranged from
> $10 to $38; the median fee was $27, charged on a per-transaction
> basis in almost all cases.  **In this context, a $27 fee charged for a
> single advance of $60 that was repaid in two weeks roughly
> translated into an APR of 1,173 percent.**  Many surveyed banks
> (24.6 percent) assessed additional fees on accounts that remained
> in negative balance status in the form of flat fees or interest
> charged on a percentage basis.

FDIC Study of Bank Overdraft Programs, 2008,

https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf [last viewed April
22, 2020] (emphasis added).

19.     Financial institutions can also charge a *contracted* NSF fee when a customer's

checking account purportedly lacks sufficient funds to cover an item and the financial institution opts to return the transaction item unpaid rather than cover it. Although there is very little, if any, risk to financial institutions when they return an item unpaid, they still charge customers a very expensive fee for this purported "service."

20. The CFPB has noted that, as opposed to overdraft program coverage, financial institutions' return of items as unpaid, which often results in the assessment and collection of insufficient funds fee charges (which the CFPB refers to as "NSF fees"), confers little, if any, benefit to consumers:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (*i.e.*, result in overdrafts) or returned unpaid (*i.e.*, were NSFs). Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. **In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due**.

CFPB, CFPB Study of Overdraft Programs (June 2013), p. 26 (internal footnote omitted) (emphasis added), https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf [last viewed April 22, 2020].

21. Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees. Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 [last viewed April 22, 2020].

22. Since 2000, the average amount of checking account transactions has become much lower because customers, and especially young customers, use debit cards instead of cash or credit cards for everyday purchases. However, while the average transaction amount is substantially

lower and provides much less risk and exposure to the bank if it causes an overdraft, the average cost of overdraft and NSF fees per transaction has gone up. In fact, the average overdraft fee at a bank is now $32, up from $20 in 2000, which far outpaced the rate of inflation during that time. *Id*.; MarketWatch, *The Average Credit Union Overdraft Fee Has Almost Doubled Since 2000* (March 27, 2017) https://www.marketwatch.com/story/credit-unions-charge-almost-as-much-as-major-banks-in-overdraft-fees-2017-03-24 [Last viewed April 22, 2020].

23.     Defendant's financial filings and practices reveal that it has followed these trends to the letter. Defendant charges an overdraft and NSF fee of $36 per item, higher than the average usually charged by banks and other comparable institutions. Even if Defendant had been properly charging overdraft and/or NSF fees, the $36 overdraft/NSF fee bears no relation to the bank's minute risk of loss or cost for administrating the Defendant's overdraft and NSF services. Nevertheless, the practical effect of the fee is to charge those who pay it for overdraft purposes an interest rate with an APR in the thousands.

24.     Accordingly, the overdraft and NSF fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee.

25.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb them. Younger, lower-income, and non-white account holders are among those most likely to be assessed overdraft fees. Pew Charitable Trust Report, *Overdrawn*, at p. 1 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf [last viewed April 22, 2020]. A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. at p. 3. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. *Id*. at p. 4. And non-whites are 83% more likely to pay an overdraft fee than whites. *Id*. at p. 3.

**ACCOUNTING TRICKS TO CHARGE OVERDRAFT AND NSF FEES ON AN ACCOUNT WITH SUFFICIENT FUNDS TO PAY A TRANSACTION**

26.     As a matter of background and to understand the banks' and credit unions'

improper overdraft practices, the various balances affecting customer checking accounts must be understood. Either unknown to customers, or confusing even if known by customers, there are three balances associated with a checking account: the "balance;" the "collected available balance;" and, the artificial "available balance."

27.     Not all these balances are equal. There is one official and real balance. It is often referred to just as "balance," or a bank may call it "actual balance," "current balance," or "ledger balance." Whatever it is called, it is the money actually in the account without bookkeeping adjustments for either upcoming authorized charges or holds the bank may place on deposits already made and placed in the account. It is the official balance of the account. It is the balance provided to customers in monthly statements, which are the official records of any account's activity. It is the balance used to determine interest on deposits and any minimum balance requirements. It is the balance used by Defendant to report its deposits to regulators, shareholders, and the public. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. And it is the balance used by credit reporting agencies when they decide Defendant's credit ratings.

28.     The "collected balance" or "collected funds balance" is the "balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP").

29.     The "available balance" is a completely different calculation from the "collected balance" or the real "balance." It is an artificially created internal risk management calculation developed to determine which transactions to process and which to return in line with likely upcoming debit charges and deposits that did not clear the bank's or credit union's FAP.

30.     Over time, as financial institutions jumped on the overdraft and NSF fee train for revenue purposes, they decided to use their internal and artificial "available" balance not only for the legitimate use of managing pay or return decisions based on activities that it anticipated in the future, but also to assess overdraft and NSF fees on this artificial balance, rather than the real "balance." Generally, the result is that 10-20% of overdraft and NSF fees are assessed on

transactions where sufficient money was in the account and thus it should not have been considered overdrawn.

31.     This practice is not only unfair on its face, but more important, financial institutions often do not contract with customers to authorize them to charge overdraft or NSF fees on transactions when the account had sufficient money to cover a transaction. The contracts with customers specifically state that such fees will be assessed only when there is insufficient money in the account to cover the transaction ("balance"). They do not contract with customers to use the artificial "available balance" for assessing overdraft and NSF fees.

**REPEAT FEES ON A SINGLE RETURNED TRANSACTION ALSO JUICES PROFITS**

32.     Charging overdraft and NSF fees when there is money in an account to cover a transaction is just one way that banks and credit unions manipulate checking accounts to increase profits. They also contract and disclose to customers that they will only charge a single NSF fee when they opt to return a check or ACH due to a lack of funds in the account. For ACH charges, the rejection of the electronic requested charge is completely automated, and results in no risk cost to the financial institution. There is also virtually no cost to administer the rejection as it is an automated computer function. However, the NSF fee is the same as if the transaction was paid into overdraft by the financial institution. But what is worse, financial institutions like Defendant, not only charge one NSF fee for a returned item ($36 here), they charge multiple fees for insufficient funds on the same item  and attempt to justify the practice as caused by a merchant submitting the same item for payment multiple times.

33.     Not only is this an unfair charge, it is not authorized by Defendant's contracts with customers. Those contracts do not disclose or permit the charging of multiple NSF fees based on the same transaction with the same merchant. Nor do they permit charging an NSF fee followed by an overdraft fee on the same item if the item is paid into overdraft on a second presentment. Instead, the agreements identify an insufficient funds fee as being singular on a per transaction, or item, basis.

## THE REGULATORY RESPONSE TO THE HARM CAUSED TO CUSTOMERS BY OVERDRAFT AND NSF FEES

34.     In response to financial institutions' use of overdraft and NSF fees as profit centers at the expense of vulnerable customers, the federal government implemented additional protections to customers with respect to overdraft policies.  The regulation relevant to overdraft fees is the Electronic Fund Transfer Act ("Regulation E"), 12 C.F.R. § 1005.1, *et seq*.

## REGULATION E REQUIREMENTS

35.     In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions **only** if the institution first obtained the customer's affirmative consent.  12 C.F.R. § 1005.17 (Regulation E's "Opt-in Rule").  The special treatment provided for these transactions was supported by the Consumer Financial Protection Bureau's ("CFPB") study of actual practices that found: 1) ATM and debit card transactions are by far the most frequently-occurring transactions; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.  CFPB, *Data Point: Checking Account Overdraft,* (July 2014), https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf [last viewed April 22, 2020].

36.     The Federal Reserve's regulations specified what credit unions and banks had to do in order to comply with Regulation E and charge overdraft fees on one-time debit card and ATM transactions.  They must obtain affirmative consent from the customer to charge the fees, and the affirmative consent must be obtained strictly in compliance with the Regulation E requirements.  First, the customer must be provided the Opt-in Agreement before agreeing to opt-in.  To qualify as affirmative consent, the Opt-in Agreement must accurately describe the overdraft program and include specific features of the overdraft program, including the standard overdraft practice and the enhanced overdraft program for debit card and ATM transactions.

37.     When the customer is provided with the Opt-in Agreement, it must be presented

as a standalone document and consent must be obtained separately from other consents and acknowledgements. The customer's consent cannot serve any purpose other than opting into the overdraft program. The consent cannot be given through a default, pre-selected, checked box and the financial institution may not provide different terms for the account depending on whether or not the customer opted into the overdraft program. Finally, the customer's affirmative consent must be documented either with the customer's signature, or by mailing the customer a confirmation that he or she opted in pursuant to their request 1) after being provided the Opt-in Agreement and 2) after being notified of the option to opt-out at any time.

38.     If the financial institution fails to obtain proper, affirmative consent from the customer in a manner that meets all of Regulation E's Opt-in Rule requirements, it may not charge overdraft fees on ATM and one-time debit card transactions.

39.     Here, Defendant utilized an Opt-in Agreement that misinformed members about the standard overdraft and NSF policies by saying that a "Non-sufficient Funds/Overdraft Fee" was "$36 per item" when instead Defendant charged multiple $36 fees per item.

## HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THEIR USE OF AVAILABLE BALANCE TO ASSESS OVERDRAFT AND NSF FEES IN THE ACCOUNT AGREEMENT

40.     Financial institutions have the ability to contract and disclose their actual practice of assessing overdraft and NSF fees on the artificial "available balance" rather than the actual "balance."

41.     For example, Affinity Federal Credit Union's account agreement states, in bold, that "[a] temporary debit authorization hold affects your account balance." The language beneath this header explains that "the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold."

42.     Likewise, GTE Federal Credit Union's account agreement contains the following language:

> YOUR CHECKING ACCOUNT BALANCE: . . . Any purchases, holds, fees, charges, or deposits made on your account that have not yet posted will not appear in your actual balance . . . . Your available balance is the amount of money in your account that is available to you to use without incurring an overdraft or NSF fee. The available balance takes into account things likes holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but have not yet posted to your account . . . .

43.     Logix Credit Union has also adopted an account agreement specifically stating debit holds can cause overdrafts:

> The available balance takes into account things like holds placed on deposits and payments that have been authorized but have not yet posted to your account (such as pending debit card purchases). For example, assume you have an actual balance of $50 and an available balance of $50. If you were to swipe your debit card at a restaurant to buy lunch for $20, then that merchant could ask us to pre-authorize the payment. In that case, we will reduce your available balance by $20. Your actual balance would still be $50 because this transaction has not yet posted, but your available balance would be $30 because you have committed to pay the restaurant $20. When the restaurant submits the transaction to us (which could be a few days later), we will post the payment transaction to your account and your actual balance will be reduced by $20.

44.     Baxter Credit Union has an account agreement stating that "[a]vailable balance is used to determine when there are insufficient funds to pay an item presented for payment from the account" and describes the available balance as:

> generally equal to the actual balance, less the amount of any holds placed on recent deposits, holds for other reasons, and holds for pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account.

45.     Southland Credit Union's account agreement also states that for purposes of determining whether to assess an overdraft fee, it:

> takes into account factors such as holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account.

46.     Similarly, State Employees Credit Union of Maryland discloses that for purposes of assessing an overdraft fee, it:

takes into account things such as holds placed on deposits and
decreases in your Available Balance (such as pending debit card
purchases) that you initiated and SECU has authorized but that
have not yet posted to your account.

47.     MidFlorida Credit Union has also put forward a separate Overdraft Agreement
which states that it:

takes into account things like holds placed on deposits and pending
transactions (such as pending debit card purchases) that the Credit
Union has authorized but that have not yet posted to your account.

48.     Point Loma Credit Union explains in its account agreement that for purposes of
assessing overdraft fees:

[a]ny purchases, holds, fees, other charges, or deposits made on my
account that have not yet posted will not appear in my actual
balance.

49.     San Diego County Credit Union's account agreement states that in determining
whether an overdraft fee will be assessed against a member, "[w]e will consider all transactions
that have posted to your account, any holds that may be in place on deposits you have made, and
pending transactions (such as pending debit card purchases) that the Credit Union has authorized
but that have not yet posted to your account."  It also contains a section on authorization holds,
titled, "Authorization Holds for Debit Card Transaction," which states:

[w]e generally place a temporary hold against some or all of the
funds in the account linked to your debit card if and when an
authorization request is obtained, [and that] [t]he amount of the
authorization hold will be subtracted from your available balance."

## HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THAT A SINGLE NSF ITEM CAN RESULT IN MULTIPLE OVERDRAFT FEES

50.     Similarly, unlike Defendant here, other banks and credit unions have been able to
properly contract and disclose the practice of charging multiple fees for the representment of the
same item.  For example, Air Academy Federal Credit Union clearly states: an NSF fee is
"$32.00 **per presentment**."

51.     Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic
transactions/payments) returned unpaid due to insufficient/non-

sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

52.    Delta Community Credit Union states its NSF fee is "$35 **per presentment**."

Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

53.    Glendale Federal Credit Union lists its NSF fee as "$30 **per presentment**."

54.    First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

55.    First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and any subsequent presentment(s)." Further, in its Account Agreement, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**. For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one** check that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees.**

56.    Liberty Financial states its NSF fee is "27.00 **per presentment**."

57.    Los Angeles Federal Credit Union lists its NSF fee as "$29 **per presentment**."

58.    Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** . . . .

59.     Meriwest Credit Union lists its fee as "$35.00/item **per presentment**."

60.     Partners 1st Federal Credit Union states:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**.  Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

61.     Regions Bank states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item.  **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

62.     Tyndall Federal Credit Union lists its NSF fee as "$28.00 **per presentment** (maximum 5 per day)."

**HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THEIR USE OF AVAILABLE BALANCE RATHER THAN THE ACTUAL BALANCE TO ASSESS OVERDRAFT FEES IN THE REGULATION E OPT-IN AGREEMENTS**

63.     Numerous credit unions and banks that utilize the artificial "available balance" rather than the money in the account ("balance") to assess overdraft fees contract and affirmatively disclose this practice in their Opt-in Agreements.  As just one example, TD Bank's Opt-in Agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  Your available balance is reduced by any

'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy."

64.     As another example, Credit Union 1, a credit union with over 87,000 members, states in its Opt-in Agreement, "[a]n overdraft occurs when you do not have enough available money (i.e., less any holds) in your checking account to cover a transaction, but we pay it anyway."

65.     Similarly, Communication Federal Credit Union's Opt-in Agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  **'Available Balance' is your account balance less any holds placed on your account."**  (Emphasis added.)

66.     Further, the Opt-in Agreement for San Diego County Credit Union explains: "In determining the available balance in your account, **we will consider** all transactions that have posted to your account, **any holds that may be in place on deposits you have made and pending transactions (such as pending debit card purchases) that [have been] authorized but that have not yet posted to your account."**  (Emphasis added.)

67.     The Opt-in Agreement for EECU explains for five-pages on the same form requiring signature pursuant to Regulation E for overdraft coverage, including on page two, that "Your available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card transactions) that the credit union has authorized but that have not yet posted to your account.  **In other words, the available balance is your actual balance less any pending ATM withdrawals, debit card purchases, ACH transaction, checks being processed or other pending withdrawals from your account and less any deposits that are not yet available due to the credit union's Funds Availability Policy."** (Emphasis in original.)

68.     In addition, financial institutions that charge NSF fees each time an item is represented for payment clearly disclose it as part of the standard overdraft practices in the Opt-in Agreement.  For example, People Driven Credit Union states in its Opt-in Agreement that

"[w]e will charge you an NSF fee of $30.00 each time we reject an item" and "[a] particular item may be presented for payment multiple times [and] [y]ou may be charged an NSF or overdraft fee for each presentment."

69.     There are countless other examples of financial institutions accurately explaining the basis for imposing overdraft or NSF fees in their Opt-in Agreements.  Financial institutions can accurately describe their overdraft programs in their Opt-in Agreements and Regulation E does not preclude them from doing so.  When financial institutions fail to accurately describe, mislead, or misrepresent their overdraft policies in their Opt-in Agreements, they breach their Agreements when they charge overdraft fees on ATM and non-recurring debit card transactions when there is a positive balance.  They also violate Regulation E.  Further, financial institutions that fail to comply with other requirements of Regulation E's Opt-in Rule as laid out in Paragraphs 35-39, *supra*, have not obtained the affirmative consent needed to assess overdraft fees as governed by Regulation E.

70.     The importance of transparent checking account fee disclosures for both comparison shopping prior to opening an account, and avoiding overdraft and other fees after opening an account, are foremost:

> Bank accounts are an essential financial product, used by 9 in 10 American households, and need to be safe and transparent. Account agreements and fee schedules provide customers with account costs, terms, and conditions.  Among the largest U.S. banks, however, the median length of checking account disclosure documents is 40 pages, and the information is presented in varied formats with inconsistent wording, making it difficult for consumers to easily find the information they need to comparison shop, avoid overdraft and other fees, and manage their money.

The Pew Charitable Trusts, *The Benefits of Uniform Checking Account Disclosures,* at p. 1 (Nov. 2015), (internal footnotes omitted), https://www.pewtrusts.org/-/media/assets/2015/11/consumerbanking_accountdisclosurebrief.pdf  [last viewed April 22, 2020].  Accordingly, courts have come down heavy on banks and credit unions that have failed to accurately describe and misrepresent their overdraft and NSF fee practices.

## **FACTUAL ALLEGATIONS AGAINST DEFENDANT**

71.     At all relevant times, Defendant has had an overdraft and NSF fee program in place which, *inter alia*, is: 1) contrary to the express and implied terms of its contracts with customers; 2) contrary to Defendant's representations about its overdraft and NSF fee program to its customers; and 3) contrary to its customers' expectations regarding the assessment of such fees.

72.     Defendant has an improper practice of charging multiple fees for the same electronic transaction or item.  Defendant charges a $36 fee when an electronic transaction or item is first processed for payment and Defendant determines that there is not enough money in the account to cover the transaction.  Defendant then charges an *additional* NSF or overdraft fee if the same item is presented for processing again by the payee.

73.     Defendant's practice of charging additional NSF or overdraft fees for the representment of the same item violates its "Personal Deposit Account Agreement" (hereinafter "Account Agreement").  (The Account Agreement attached hereto as Ex. 1, dated April 9, 2016, is believed to be one of the operative agreements during the class period and representative of the account agreements in the class period.)  The Account Agreement is a uniform written contract that Defendant entered with Plaintiff and the other Class Members  The Account Agreement states in the section "Insufficient Funds – Overdrafts and Returned Items":  "We may pay all, some, or none of your overdrawn items, without notice to you.  If we do not authorize and pay *an item*, then we will decline or return *the transaction* unpaid.  In either case, *the insufficient funds fee* will still apply." (emphasis added.)  In other words, the Account Agreement drafted by Defendant states, in the singular, "**the insufficient funds fee**" will be assessed, not plural "**multiple insufficient funds fees**" will be assessed.  Further "an item" means a single electronic transaction, and a "representment" or "retry" of "an item" does not change it into a new or different item.  It is still the same "item" being presented by the same merchant in the same dollar amount; not a new "item."  An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly

become a new, unique additional "item" for fee assessment purposes.  Furthermore, although Plaintiff is unaware at this time whether Defendant's Fee Schedule was ever served on Class Members in a manner required to make it effective, and this will require discovery, the Fee Schedule also refers to a singular "NSF Returned Item Fee" of "$36.00."

(*See* Fee Schedule, dated Nov. 2019, Ex. 2.)

| Non-sufficient Funds/Overdraft Charges (Checking and Savings) | |
| --- | --- |
| Overdraft Paid Item Fee | $36.00 |
| NSF Returned Item Fee | $36.00 |
| *(Checks paid in numerical order on day received. An overdraft item may be created by check/draft, in-person withdrawal, ACH item or other electronic means.)* | |

74.     Defendant's standardized Account Agreement and Fee Schedule did not disclose this practice and misrepresented to customers that Defendant would only charge a single fee per item.  Further, because Defendant charged NSF fees improperly, and because Defendant's improper deduction of the additional improper $36 fee from a customer's account further decreased the customer's "balance" or "available balance," it likely generated even more NSF fees or overdraft fees to the account.

75.     Courts in various jurisdictions have recognized that when banks and credit unions charge multiple NSF fees on the same item while failing to clearly disclose such practice, it gives rise to claims and causes of action on a class wide basis.  *See e.g.*, *Morris v. Bank of America*, No. 3:18-cv-00157-RJC-DSC, 2019 WL 1274928 (W.D.N.C., March 29, 2019) (Order denying motion to dismiss allegations regarding improper repeat NSF claims); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, Docket No. 23 (E.D. Ark., Oct. 21, 2019) (Order denying motion to dismiss repeat NSF claims); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co., Missouri, Circuit Court, Oct. 18, 2019) (Order denying motion to dismiss repeat NSF claims); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn., Chancery Court, Oct. 17, 2019) (Order denying motion to dismiss repeat NSF claims); *Noe v. City National Bank of West Virginia*, Civil Action No. 3:19-0690 (S.D.W.V. Feb. 19, 2020) (Order denying motion to dismiss repeat NSF claims); *Ingram v. Teachers Credit Union*, Cause No. 49D01-1908-PL-

035431 (Indiana Commercial Court, Marion County Superior Court) (Order denying motion to dismiss repeat NSF claims); *Perks, et al. v. TD Bank, N.A.,* Civil Action No. 18-CV-11176 (S.D.N.Y. Mar. 17, 2020) (Order denying motion to dismiss breach of contract claim for repeat NSF fees); and *Coleman, et al. v. Alaska USA Federal Credit Union,* Civil Action No. 3:19-cv-0229-HRH (D. Alaska Apr. 14, 2020) (Order denying motion to dismiss plaintiffs' breach of contract and good faith and fair dealing claims for repeat NSF fees).

76.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

77.     Meanwhile, Plaintiff and the Class Members could not have reasonably anticipated the harm resulting from Defendant's practice throughout the class period because the Account Agreement and Fee Schedule specifically stated that only a singular fee would be charged for "an" item.

78.     A second contract was also required for Defendant to collect overdraft fees on certain types of transactions.  (*See* Opt-in Agreement, Ex. 3.)  Further, whether that contract was entered into or not by customers, based on information and belief, Defendant made a concerted effort to have all customers read and review the contract. In addition to setting forth Regulation E disclosures to permit Defendant to charge overdraft fees on one-time debit and ATM transactions, this contract also set forth Defendant's standard overdraft policy.  This document was the most effective, whether entered into or not, to convey Defendant's overdraft and NSF practices.  It was a standalone document in large print that purported to advise the customers it contained everything the customers needed to know about Defendant's overdraft and NSF policies.  This in contrast to the dense legal language buried in the middle of the Account Agreement. This document specifically stated that Defendant charges a "Non-sufficient Funds/Overdraft Fee of $36.00 per item."  There was not any reference in this document to Defendant charging multiple fees of $36.00 each time the same item was represented for payment by a merchant

79.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

**PLAINTIFF HAS BEEN DAMAGED AND HAS STANDING TO BRING THIS LAWSUIT**

80.     Plaintiff and the Class Members were harmed by Defendant's policy and practice of charging an NSF fee more than once for the same "item."  By doing so, Defendant breached its contracts with Plaintiff and the absent Class Members.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful NSF fee; however, Plaintiff has already uncovered some examples.  Specifically, on July 1, 2019, Defendant charged Plaintiff a "NSF Returned Item(s) Fee" totaling $72.00 for two returned transactions.  It charged $36.00 for a $45.15 returned item to Transamerica Ins. (Trans. No. 3262) and $36.00 for a $112.75 returned item to Transamerica Ins. (Trans. No. 1701).  These fees are not in dispute as they were a $36 NSF fee for each of those items.  However, what was not authorized by the Account Agreement was Defendant charging Plaintiff another $72.00 in NSF fees on July 11 when Transamercia Ins. resubmitted the same two items for payment and Defendant again returned them unpaid.  In charging a second $36 fee for the same item, Defendant increased the fee for each of these returned items from $36 to $72.  That was not authorized and is in direct conflict with the Account Agreement and Fee Schedule that identifies a $36 fee for a NSF returned item – not a $72 fee.

81.     The same situation occurred again with two more Transamerica payments.  On April 1, 2019, Plaintiff made two Transamerica payments in the amount of $45.15 and $112.75 and Defendant returned them unpaid, charging a $72.00 NSF Returned Item(s) Fee to Plaintiff.  Then on April 10, Transamerica represented those same two items for payment and Defendant again charged Plaintiff $72.00 in fees for the same two items, an act that violated the Account Agreement.

82.     Defendant's assessment, and unilateral taking of, improper NSF fees further reduced the balance and amount of funds in customers' accounts, resulting in and aggressively

causing subsequent, otherwise non-overdraft or non-NSF transactions to be improperly treated as transactions for which Defendant assessed further overdraft or NSF fees. A complete evaluation of Defendant's records is necessary to determine the full extent of Plaintiff's and Class Members' harm from this practice.

## CLASS ACTION ALLEGATIONS

83.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

84.     Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2) and (b)(3) on behalf of the following Class.

85.     The "Class" is composed of the following:

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with Defendant who incurred more than one NSF fee or an NSF fee followed by an overdraft fee for the same item during the period beginning three years preceding the filing of this Complaint and ending on the date the Class is certified.**

86.     Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

87.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

88.     **Numerosity (Federal Rules of Civil Procedure, Rule 23(a)(1))** – The members of the Class are so numerous that joinder of all members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks with similar practices, that the Class is likely to include thousands of members.

89.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's customers has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definition identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

90.     **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- whether, pursuant to the Account Agreement and/or Fee Schedule, Defendant contracted that it would only charge "a" single fee for an NSF "item" rather than charge repeat fees for the same "item";

- whether defendant breached the Account Agreement and/or Fee Schedule by assessing repeat fees on the same "item";

- whether the language of the Opt-in Agreement described Defendant's standard overdraft service pursuant to which Defendant assessed overdraft and/or NSF fees;

- whether the language in the Account Agreement and/or Fee Schedule is ambiguous; and

- whether Defendant is liable for breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received.

91.     **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members

are substantially the same because all of the relevant agreements between Defendant and its customers were identical as to all relevant terms, and also because, *inter alia*, the challenged practice of charging customers multiple fees for the same item was uniform for Plaintiff and all Class Members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

92.     **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

93.     **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff

knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

94.     Plaintiff is not aware of any separate litigation instituted by any of the Class Members against Defendant. Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because Defendant's headquarters are located in this District and the claims arose from activities that occurred largely in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

95.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

96.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

97.    Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and,

- the difficulties likely to be encountered in the management of a class action.

**FIRST CAUSE OF ACTION**

**(Breach of the Account Agreement)**

98.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

99.    Plaintiff and each of the Class Members entered into the Account Agreement, an example of which is attached hereto as Ex. 1, with Defendant covering the subject of NSF and overdraft fees.  This contract was drafted by and is binding on Defendant.

100.    Among other promises Defendant made in the Account Agreement, Defendant promised that it would assess only a single NSF fee for an unpaid, returned item due to purported insufficient funds when, in practice, it charged a $36 fee when an electronic transaction or item was first processed for payment and Defendant determined that there was not enough money in the account to cover the transaction, and then charged an *additional* NSF or overdraft fee if the

same item was presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment.

101.     Defendant's practice violates its Account Agreement which states in the section "Insufficient Funds – Overdrafts and Returned Items":  "We may pay all, some, or none of your overdrawn items, without notice to you.  If we do not authorize and pay *an item*, then we will decline or return *the transaction* unpaid.  In either case, *the insufficient funds fee* will still apply." (emphasis added.)  This means that Defendant can charge a singular "insufficient funds fee" for "an item." Yet Defendant wrongfully treated a "retry" or "representment" of an item as a new and separate "item" justifying additional NSF or overdraft fees in violation of the Account Agreement.

102.     Further, the Account Agreement along with the Fee Schedule and Opt-in Agreement failed to accurately describe the circumstances when Plaintiff and Class Members would be assessed an NSF or overdraft fee.

103.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

104.     Defendant breached the terms of the Account Agreement by, *inter alia*, assessing multiple fees for the same electronic transaction or item.

105.     As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

<u>**SECOND CAUSE OF ACTION**</u>

<u>**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**</u>

106.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

107.    Plaintiff and each of the Class Members entered into the Account Agreement with Defendant covering the subject of overdraft and NSF transactions.  The Account Agreement was drafted by and is binding upon Defendant.  In the agreement, Defendant promised that it would only charge a single fee for an item.  Yet Defendant assessed NSF and/or overdraft fees multiple times for the same electronic item.

108.    Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

109.    The material terms of the Account Agreement therefore include the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

110.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

111.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple fees for a single, unpaid returned item, or by assessing an overdraft fee on the same item that was previously assessed an NSF fee.  Defendant could easily have avoided acting in this manner by simply changing the programming in its software to charge a fee only once per item.  Instead, Defendant unilaterally elected to and did program its software to charge multiple fees each time the same item was represented for

28

payment by a merchant which would maximize its overdraft and NSF fees. In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, Defendant executed its contractual obligations, including any discretion it had, in bad faith, depriving Plaintiff and the Class Members of the full benefit of the Account Agreement.

112.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**THIRD CAUSE OF ACTION**

**(Unjust Enrichment/Restitution)**

113.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

114.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

115.     Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

**FOURTH CAUSE OF ACTION**

**(Money Had and Received)**

116.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

117.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law

and/or fact.

118.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## **PRAYER**

WHEREFORE, PLAINTIFF and CLASS MEMBERS pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For an order enjoining the wrongful conduct alleged herein;

5.    For costs;

6.    For pre-judgment and post-judgment interest as provided by law; and

7.    For such other relief as the Court deems just and proper.

DATED:  May 19, 2020                        Respectfully submitted,

MARK C. TANENBAUM, P.A.

By:    s/Mark C. Tanenbaum
Mark C. Tanenbaum, Bar No. 4017
mark@tanenbaumlaw.com
1017 Chuck Dawley Blvd., Suite 101
Mt. Pleasant, SC 29464
Telephone: (843) 577-5100
Facsimile: (843) 722-4688

Richard A. Harpootlian, Bar No.1730
Dick Harpootlian
rah@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
P.O. Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848

Facsimile: (803) 252-4810

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
David C. Wright, CA Bar No. 177468*
dcw@mccunewright.com
Michele M. Vercoski, CA Bar No. 244010
and NJ Bar No. 031012004*
mmv@mccunewright.com
McCUNE WRIGHT AREVALO, LLP
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
McCUNE WRIGHT AREVALO, LLP
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

Attorneys for LATOYA LASHAY FLUDD,
individually, and on behalf of all others
similarly situated

*Pro Hac Vice applications to be submitted