UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| LATOYA LASHAY FLUDD and WANDA SUE BUTCHER, individually, an on behalf of all other similarly situated, | ) ) ) | |
| | ) | Civil Action No. 2:20-cv-1959-BHH |
| Plaintiffs, | ) ) | **Opinion and Order** |
| v. | ) ) | |
| SOUTH STATE BANK, and DOES 1-100, | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court on the Defendant South State Bank's[1] motion to dismiss Plaintiffs Latoya Fludd and Wanda Butcher's first amended class action complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 38.) For the reasons set forth in this order, Defendant's motion is denied.

## BACKGROUND

South State Bank ("South State" or "the Bank") is a large bank with locations and customers in over 100 cities located in four states, managing more than $15 billion in assets. (Am. Compl. ¶ 19, ECF No. 35.) South State offers its customers various financial services, including checking accounts where account holders can deposit and withdraw their money. (*Id.* ¶ 20.) When processing debit transactions, South State assesses overdraft fees, incurred when the Bank pays an item into overdraft, as well as NSF fees, incurred when an item is returned due to an overdrawn account. (*Id.* ¶ 21.) Overdraft and

---

[1] The Court is informed that South State Bank, N.A. has taken the place of South State Bank in this action. Effective June 8, 2020, South State Bank merged with and into CenterState Bank, N.A. Immediately after the merger, CenterState Bank, N.A. changed its name to South State Bank, N.A. (ECF No. 38 n.1.)

NSF fees constitute a significant source of revenue for financial institutions like South State. (*Id.* ¶ 26.) In 2019, South State reported collecting more than $30 million in consumer overdraft-related service charges on accounts intended primarily for individuals with personal, household, or family use. (*Id.* ¶ 21.)

To determine whether an overdraft has occurred, South State uses an internal bookkeeping calculation called "available balance" instead of an account's actual balance.[2] (*Id.* ¶¶ 5, 31–34.) The actual balance includes all the money in an account at a point in time; it is an account's official balance, and the balance customers receive in monthly statements. (*Id.* ¶ 32.) The available balance starts with the actual balance, but subtracts any holds placed on the funds in the account that may affect the amount of money in the account in the future. (*Id.* ¶ 47.) Plaintiffs Latoya Fludd ("Fludd") and Wanda Butcher ("Butcher") (collectively, "Plaintiffs"), allege that South State's use of the available balance bookkeeping method routinely leads to an overdraft fee even though sufficient money remains in the account after a transaction is paid. (*Id.* ¶¶ 35, 47.) Plaintiffs provide the following hypothetical to demonstrate this circumstance:

• An individual has $1,000 in her account, with two bills, rent and car, totaling $1,000 earmarked for payment at a later date.

• In the interim, a $40 water bill is due and paid immediately, leaving $960 in the account.

• Under actual balance accounting, the individual can pay the $40 bill and replenish the account before the two bills totaling $1,000 are paid without being assessed an overdraft fee.

---

[2] The actual balance is sometimes referred to as the "ledger balance," "current balance," or simply "balance." (Am. Compl. ¶ 32.)

• Under available balance accounting, the individual would be assessed an overdraft fee for the $40 bill because the individual's $1,000 was already held for future bill payments, even though the $40 was in the account and the Bank did not need to advance its own money to cover the transaction.

(*Id.* ¶¶ 48–50.)

Regulators, including the Consumer Financial Protection Bureau ("CFPB") and the Federal Deposit Insurance Corporation ("FDIC"), have flagged financial institutions' use of the available balance method to assess overdraft fees as "potentially unfair and deceptive" when "not sufficiently disclosed" to consumers. (*Id.* ¶ 51.) Plaintiffs allege, based on publicly-available empirical reports, that the financial impact of excessive overdraft fee practice disproportionately falls on "the most vulnerable Americans," with younger, lower-income, and non-white account holders being most likely to be assessed overdraft fees. (*Id.* ¶ 30.) In 2009 the Federal Reserve Board amended Regulation E to require institutions to obtain affirmative consent ("opt-in") from account holders before enrolling them in overdraft programs that would assess fees on ATM and non-recurring "point of sale" debit card transactions. (*Id.* ¶ 41.) Regulation E mandates that the opt-in agreement be a stand-alone document, not combined with other forms, disclosures, or contracts. (*Id.* ¶ 43); 12 C.F.R. § 1005.17(b)(1)(i). Moreover, the institution must disclose its overdraft policies in the opt-in agreement in a "clear and readily understandable manner." (Am. Compl. ¶ 43); 12 C.F.R. § 1005.4(a)(1).

In South State's case, its Opt-in Agreement indicates that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (*Id.* ¶¶ 53–55.) The relevant excerpt from the Opt-in Agreement appears as

follows:

---

**Regulation E Overdraft Authorization Form**

An overdraft (i.e. non-sufficient funds) occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts (i.e. non-sufficient funds) in two different ways:

**1.** We have standard overdraft practices that come with your account called Automatic Overdraft Privilege (AOP) that can charge a Non-sufficient Funds/Overdraft Fee of $36 per item.

---

(ECF No. 1-3.) Plaintiffs allege that this language conflicts with, or is confusingly ambiguous regarding, the use of the available balance accounting method to assess overdraft fees. (*See* Am. Compl. ¶¶ 53–55.)

On May 4, 2020, South State assessed Ms. Butcher a $36 overdraft fee based on a $0.99 non-recurring debit card transaction. (*Id.* ¶ 108.) She alleges this charge violated Regulation E because South State did not use an Opt-in Agreement that accurately described its overdraft practices, and thereby failed to obtain her informed consent before including her in the overdraft program. (*Id.* ¶¶ 56, 108.)

In Ms. Fludd's case, South State entered into a uniform written contract with her entitled "Personal Deposit Account Agreement" ("PDAA"). (ECF No. 1-1.)[3] In a section entitled "Insufficient Funds – Overdrafts and Returned Items," the PDAA states: "We may pay all, some, or none of your overdrawn items, without notice to you. If we do not authorize and pay *an item*, then we will decline or return *the transaction* unpaid. In either case, *the insufficient funds fee* will still apply." (*Id.* at 13 (emphasis added).) Thus, once South State determines that an account balance is insufficient to cover a transaction, the

---

[3] All quoted portions of the PDAA are from a version dated April 9, 2016, which Plaintiffs allege to be one of the operative agreements during the putative class period and representative of the account agreements in the class period. This is the version of the PDAA relied upon in the first amended class action complaint. (*See* ECF Nos. 1-1, 35.) Plaintiffs note that South State attached an account agreement dated April 1, 2019 to its motion to dismiss (ECF No. 38-2), that the 2019 version is outside the record, and that they challenge its authenticity. (*See* ECF No. 39 at 6 n.5.) Even if the 2019 version turns out to be applicable, it would not govern all transactions at issue given that the three-year statute of limitations runs from May 20, 2017. (*See* ECF No. 1.) In any event, Plaintiffs state that the pertinent language in the two versions appears to be the same. (*Id.*)

4

PDAA permits the Bank to charge an overdraft or NSF fee on the "item." (Am. Compl. ¶ 90.) The PDAA does not specifically address whether or not multiple fees may result from the same transaction, originally declined for insufficient funds, but later re-presented by the merchant. (*See* ECF No. 1-1.)

South State also provides consumers with a Fee Schedule. (ECF No. 1-2.) The Fee Schedule itemizes a "NSF Returned Item Fee" of "$36.00." (*Id.*) The Fee Schedule is silent as to whether multiple NSF fees may result from a merchant's re-presentment of a previously returned transaction. (*See id.*; *see also* Am. Compl. ¶ 90.) The relevant excerpt from the Fee Schedule appears as follows:

| Non-sufficient Funds/Overdraft Charges (Checking and Savings) | |
|---|---|
| Overdraft Paid Item Fee | $36.00 |
| NSF Returned Item Fee | $36.00 |
| (Checks paid in numerical order on day received. An overdraft item may be created by check/draft, in-person withdrawal, ACH item or other electronic means.) | |

(ECF No. 1-2 at 1.) The Opt-in Agreement also provides that South State charges a "Non-sufficient Funds/Overdraft Fee of $36.00 per item." (ECF No. 1-3; *see also* Am. Compl. ¶ 95.) The relevant excerpt from the Opt-in Agreement appears as follows:

| 1. | We have standard overdraft practices that come with your account called Automatic Overdraft Privilege (AOP) that can charge a Non-sufficient Funds/Overdraft Fee of $36 per item. |
|---|---|

(ECF No. 1-3.)

Plaintiffs allege that South State charges the contractual NSF fee of $36 each *time* a merchant presents an existing item for processing, even though the account holder never resubmits the original item for payment. (Am. Compl. ¶ 95.) They further allege that such "repeat fees on a single returned transaction" are fundamentally unfair, not authorized by South State's contracts with customers, and not properly disclosed in those contracts. (*Id.* ¶¶ 37–38.) Plaintiffs cite the following examples of allegedly improper

"repeat fees." On April 1, 2019, Ms. Fludd made two Transamerica payments in the amount of $45.15 and $112.75, after which South State returned them unpaid, charging her $72 in NSF Returned Item Fees ($36 per item). (*Id.* ¶ 106.) These fees are not in dispute. However, on April 10, Transamerica re-presented those same two transactions for payment and South State again charged Fludd $72 in fees for the two items. (*Id.*) This pattern repeated in July 2019. On July 1, South State charged $36 for a $45.15 returned item presented by Transamerica (Trans. No. 3262) and $36 for a $112.75 returned item presented by Transamerica (Trans. No. 1701). (*Id.* ¶ 105.) Again, the legitimacy of this first round of fees is not in dispute. Ms. Fludd does, however, dispute the legitimacy of $72 in NSF fees that South State imposed on July 11, when Transamerica re-presented the same transactions for payment and South State again declined them. (*Id.*) Fludd avers that by charging this second round of fees, South State improperly increased the fee for each of these returned items from $36 to $72. (*Id.*)

## STANDARD OF REVIEW

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

*Twombly*, 550 U.S. at 556)). In considering a motion to dismiss under Rule 12(b)(6), a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court should grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

As previously noted, to survive a Rule 12(b)(6) motion to dismiss a complaint must state "a *plausible* claim for relief." *Iqbal*, 556 U.S. at 679 (emphasis added). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010).

# DISCUSSION

## I. Regulation E Claims

South State asserts that Ms. Butcher's claims sounding in Regulation E fail for three reasons: (A) Butcher lacks standing to assert a Regulation E claim against the Bank (ECF No. 38-1 at 12–14); (B) Butcher's Regulation E claims are time-barred (*id.* at 14–17); (C) Butcher's Regulation E claims fail because South State adequately disclosed its use of available balance in its contracts with Butcher (*id.* at 17–23). The Court will address these reasons in turn.

### A. Standing

South State contends that Ms. Butcher lacks standing to assert a Regulation E claim against the Bank because the substance of Butcher's claim is dependent upon the Bank's allegedly improper use of available balance accounting, but the only transaction relied upon by Butcher in the amended complaint overdrew her account regardless of which type of balance South State utilized. (*See id.* at 12.) In other words, in the case of the particular transaction cited in the amended complaint, Butcher would have overdrawn her account by the same amount whether the Bank used the actual balance method, which Butcher asserts was required, or the available balance method, of which Butcher complains. (*Id.*) Therefore, argues South State, Butcher cannot trace her alleged harm to any particular act of the Bank, and her claim must be dismissed for lack of standing. (*Id.*)

The Court is unpersuaded by these arguments and finds that Ms. Butcher possesses standing to bring her Regulation E claim. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). South State's challenge to Butcher's standing centers on the second prong of this test and asserts that the traceability requirement is not met.

South State attaches Butcher's May 2020 account statement to its motion to dismiss in the attempt to show that Butcher's account balance on the date of the overdraft in question (May 4, 2020) was not impacted by the Bank's accounting method, and that Butcher's injury—namely, the overdraft fee—is solely traceable to her own conduct of putting the account into a negative balance. (*See* May 2020 Butcher Account Statement, ECF No. 38-3; ECF No. 38-1 at 13–14.) As a threshold matter, it is not clear that the Court can consider this exhibit without converting South State's filing into a motion for summary judgment. But even if the exhibit is permissible at this stage, the Court finds that South State's standing challenge conceives of Butcher's injury too narrowly. The requirements imposed by Regulation E on the contents of opt-in agreements are specifically designed to provide consumers with sufficient clarity about the terms of an overdraft program to make an informed choice about whether to join the program. *See* 12 C.F.R. § 1005.4(a)(1) (requiring opt-in disclosures to be "clear and readily understandable"). The gravamen of Ms. Butcher's claim is that South State's Opt-in Agreement violated Regulation E because the language it used to describe when an overdraft would occur—namely, "when you do not have enough money in your account to cover a transaction, but we pay it anyway" (ECF No. 1-3)—did not match the reality of the available balance accounting method, which assessed overdraft fees even when sufficient money remained in the account and

the Bank did not need to advance its own funds. Thus, Butcher's alleged injury includes the fact that she was enrolled in a point-of-sale debit card overdraft program without having the terms of that program accurately disclosed, putting her at an increased risk of overdrafts, when she may well have declined enrollment if the Opt-in Agreement had been "clear and readily understandable." This is enough to plausibly allege standing for a Regulation E violation, and the motion to dismiss on this basis is denied.

### B. Timeliness

Next, South State argues that Ms. Butcher's Regulation E claim is time barred because, although the amended complaint focuses on a transaction that occurred May 4, 2020, the same type of charge occurred to Butcher's account on July 22, 2019, and the Electronic Funds Transfer Act's ("EFTA") one-year statute of limitations applies to preclude Butcher's claim, which was filed on January 12, 2021.[4] (ECF No. 38-1 at 14.) South State rightly notes that EFTA claims must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. §1693m(g).[5] The Bank argues, "Courts around the country are clear that a cause of action under EFTA occurs on 'the date of the first noncompliant transfer.'" (ECF No. 38-1 at 15 (quoting *Whittington v. Mobiloil Fed. Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *13 (E.D. Tex. Sept. 14, 2017)).) "Thus, for Butcher's claim to be timely under EFTA, the ***first*** occurrence of a NSF fee being charged against her account for a debit card transaction had to occur on January 12, 2020 or later." (*Id.* (emphasis in original).) Because South State charged Butcher a NSF fee for an overdraft that resulted from a debit card transaction on July 22, 2019,

---

[4] The Regulation E theory of liability in the amended complaint does not relate back to the original complaint, so the January 12, 2021 filing date applies. (*See* Am. Compl., ECF No. 35.)

[5] Regulation E is the implementing regulation for EFTA. Therefore, EFTA's statute of limitations is applicable to Ms. Butcher's claim.

almost a year and a half before she filed her claim in this case, the Bank contends her Regulation E claim is untimely.

The Court disagrees and finds that Ms. Butcher's Regulation E claim is not time barred. Putting aside the fact that the Bank again asks the Court to consider extrinsic evidence to resolve its timeliness challenge (*see* August 2020 Butcher Account Statement, ECF No. 38-4), the crux of South State's argument regarding application of the one-year statute of limitations rests on the premise that the limitations period begins to run on the date of "the first noncompliant transfer." (*See* ECF No. 38-1 at 15.) South State cites *Whittington v. Mobiloil Fed. Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *13 (E.D. Tex. Sept. 14, 2017) (citing *Wike v. Vertrue, Inc.*, 566 F.3d 590, 595–96 (6th Cir. 2009)); *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338, 350 (D.N.H. 2018); *Wheeler v. Native Commerce Studios, LLC,* No. 2:17–CV–51, 2018 WL 447716, at *1–*2 (W.D. Mich. Jan. 17, 2018); and *Harvey v. Google Inc.*, No. 15-CV-03590-EMC, 2015 WL 9268125, at *3–*4 (N.D. Cal. Dec. 21, 2015) to support this premise. (ECF No. 38-1 at 15–17.) These cases are distinguishable and/or unpersuasive.

In *Wike*, *Wheeler*, and *Harvey*, courts found that the one-year limitations period began to run when the first in a series of *preauthorized*, *recurring* transactions took place. *See Wike*, 566 F.3d at 592–96 (finding one-year limitation period began when the first recurring monthly transfer for discount club dues occurred); *Wheeler*, 2018 WL 447716, at *1–*2 (holding, where plaintiff alleged recurring payments for membership in a "Family Protection Association" violated EFTA, that "the statute starts to run on all recurring payments upon completion of the first payment"); *Harvey*, 2015 WL 9268125, at *3–*4 (finding, where plaintiff alleged Google debited her bank account on a recurring basis

without proper written authorization in violation of EFTA, that the limitations period began when the first transaction took place); *but see Diviacchi v. Affinion Grp., Inc.*, No. 14-10283-IT, 2015 WL 3631605, *10 (D. Mass. Mar. 11, 2015) (concluding, where plaintiff alleged preauthorized, recurring debits from her bank account for membership dues to a "Benefits Package" program violated EFTA, that each transfer "constitute[d] a new and independent violation" that was actionable if it fell within one year of when the complaint was filed). However, the instant case does not involve preauthorized, recurring transfers; rather, the provision of Regulation E at issue here, 12 C.F.R. § 1005.17, applies to *non-recurring* debit card and ATM transactions. Courts have rejected the same timeliness challenge brought by South State in cases involving materially similar facts.

For example, in *Smith v. Bank of Hawaii*, No. 16-00513-JMS-RLP, 2018 WL 1662107 (D. Haw. Apr. 5, 2018), the court explained the difference between the preauthorized, recurring transfer context and the non-recurring debit card transaction context:

> The difference between preauthorizing a series of transfers and opting in to an overdraft service is both significant and meaningful. In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.
> And Regulation E reflects these differing factual circumstances. It requires a preauthorized transfer to be in writing, focusing on the authorization itself. 12 C.F.R. § 1005.10(b). But with regard to the overdraft services, it focuses not only on the requirements for a consumer's opt-in, but it also expressly prohibits "any fee or charge on the consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service" unless proper disclosure is made. 12 C.F.R. § 1005.17(c)(2); *accord* 12 C.F.R. § 1005.17(b)(1) (providing "a financial institution holding a consumer's account *shall not assess a fee or charge* on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service *unless*" it complies

with its disclosure obligations) (emphasis added). Thus, the *violation* for purposes of determining the limitation period for a preauthorized transfer may properly be characterized as an omission. But when a bank assesses overdraft fees or charges, it violates the express language of Regulation E every time it imposes a fee or charge.

*Id.* at *5 (emphasis in original). The *Bank of Hawaii* court concluded that it "makes sense in the overdraft context to view each fee separately—as an allegedly unauthorized charge—whereas it might not make sense to view preauthorized recurring transfers separately." *Id.* Accordingly, the court held that the defendant bank was not entitled to summary judgment on the plaintiff's Regulation E claim based on a timeliness challenge, because the plaintiff had adequately shown he was assessed an improper overdraft fee within one year of the day he filed his complaint. *Id. See also Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 266 (D. Mass. 2019) (holding an overdraft fee charged for non-recurring transactions constituted a Regulation E violation every time the fee was imposed and all disputed overdraft charges occurring within one year of complaint's filing were actionable); *Salls v. Digital Fed. Credit Union*, 349 F. Supp. 3d 81, 91–93 (D. Mass. 2018); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 376 n.3 (D. Conn. 2018) (declining to consider bank statements offered by defendant with its motion to dismiss in an attempt to show that overdraft claims related to non-recurring debit transactions were time barred); *Pingston-Poling v. Advia Credit Union*, 333 F. Supp. 3d 745, 747–49 (W.D. Mich. 2018) (agreeing with *Bank of Hawaii* ruling and concluding that "overdraft fees constitute discrete harms that do not constitute a single transaction providing for recurring transfers"); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2018 WL 4286181, at *3–*4 (D. Nev. Sept. 7, 2018).

The overdraft cases cited by South State, *Whittington* and *Walbridge*, have been found unpersuasive for the precise reason that they fail to distinguish between preauthorized, recurring transfers and non-recurring debit transactions resulting in overdraft fees. *See, e.g.*, *Pingston-Poling*, 333 F. Supp. 3d at 749 ("[N]either case considered the differences between preauthorized recurring transfers and non-recurring overdraft fees. Rather, both cases simply apply the rule for recurring transactions to non-recurring overdraft charge without analysis."). The Court agrees with the reasoning and analysis in *Bank of Hawaii*, and finds the authorities cited by South State to be inapplicable and/or unpersuasive as to the Bank's assertion that Ms. Butcher's Regulation E claim is untimely. Therefore, the motion to dismiss premised on this basis is denied.

### C. Available Balance Disclosure

The Court need not linger on South State's third challenge to the viability of Ms. Butcher's Regulation E claim. The Bank asserts that the amended complaint fails to state a claim upon which relief may be granted because South State adequately disclosed is use of available balance to assess overdrafts in its contracts with Butcher. (ECF No. 38-1 at 17.) Essentially, South State argues that when all the relevant provisions in the PDAA and the Opt-in Agreement are read in harmony, they unambiguously disclose that the Bank uses the available balance method to make overdraft determinations. (*See id.* at 17–23.)

The Court finds that the amended complaint states a viable claim for violation of Regulation E because Ms. Butcher has made a plausible showing that the Opt-in Agreement fails to clearly and accurately describe South State's overdraft program. The primary objective of EFTA, and by derivation Regulation E, is "the protection of individual

consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b)). To fulfill that mandate, Regulation E governs certain aspects of a financial institution's overdraft policy. In particular, it establishes that "a financial institution . . . shall not assess a fee or charge on a consumer's account for paying an . . . one-time debit card transaction pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing . . . segregated from all other information, describing the institution's overdraft service." Electronic Fund Transfers, Part 205, § 205.17 Requirements for overdraft services, 74 Fed. Reg. 59033 (Nov. 17, 2009), 59052. The intent of this notice is to "assist consumers in understanding how overdraft services provided by their institutions operate" such that consumers can make an informed choice about opting into the institution's overdraft service. *See id.* at 59036. EFTA and its regulatory provisions, including Regulation E, are accorded "liberal construction in favor of the consumer." *Gunter v. United Fed. Credit Union*, No. 3:15–CV–00483–MMD–WGC, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017) (citation and quotation marks omitted). Regulation E's requirements are not merely technical jargon,  they establish "'rights, liabilities, and responsibilities'" for imposing overdraft charges. *Id.* (quoting 15 U.S.C. § 1693(b)). Regulation E mandates that an opt-in agreement "describe[] the institution's overdraft service" in a "clear and readily understandable way." 12 C.F.R. §§ 1005.17(b)(1)(i), 1005.4(a)(1).

Plaintiffs' amended complaint alleges a plausible Regulation E violation because the Opt-in Agreement states that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway" (ECF No. 1-3), whereas the Bank's available balance practice allegedly results in overdraft fees when

15

sufficient money remains in the account to cover the transaction in question. (*See* Am. Compl. ¶¶ 35, 47, 53–56.) Moreover, the statement "we pay it anyway" suggests that the Bank advances its own funds to cover an overdraft, but the amended complaint describes situations in which the account holder's own money satisfies the transaction and an overdraft fee is still assessed. (*Id.*) If the Bank's Opt-in Agreement inaccurately or incompletely describes the conditions under which overdraft fees are assessed for ATM and non-recurring debit card transactions it can hardly be said to describe South State's overdraft service in a "clear and readily understandable way." Courts have found the same language from South State's Opt-in Agreement to be ambiguous as to the account balance calculation a financial institution uses to assess overdraft fees. *See, e.g.*, *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1238, 1243–44 (11th Cir. 2019) (reversing district court's order granting motion to dismiss and finding it "plausible that the notice does not describe the overdraft service in a 'clear and readily understandable way'" given that the language "enough money in your account" is "ambiguous because it could describe either the available or the ledger balance calculation method" (quoting 12 C.F.R. § 1005.4(a)(1)). Thus, Ms. Butcher has plausibly alleged that she was not provided sufficient information regarding the Bank's overdraft practices to give informed consent, and the motion to dismiss the Regulation E claim for failure to state a claim is denied.

## II. Contract and Quasi-Contractual Claims

South State asserts that the remaining claims in the amended complaint should be dismissed for four reasons: (A) federal law preempts Ms. Fludd's state law claims; (B) Fludd's breach of contract claim fails because the PDAA discloses the fees charged in this case; (C) Fludd's claim for breach of the implied covenant of good faith and fair

dealing fails because it is not a stand-alone claim in South Carolina; and (D) Plaintiffs'
claims for unjust enrichment/restitution and for money had and received (the "quasi-
contractual claims") are covered by the express terms of a contract, and therefore barred
under South Carolina law. (ECF No. 38-1 at 23–35.) The Court will address each of these
assertions in turn.

### A. Preemption

Congress may preempt state law through statutes or regulations either expressly
through their language or impliedly through their aim and structure. *See Abbot by Abbot
v. Am. Cyanamid Co.*, 844 F.2d 1108, 1111 (4th Cir. 1988) (explaining various manners
in which federal law can preempt state law, including express statutory preemption,
implied preemption through federal occupation of an entire field of regulation, and conflict
preemption). "Federal regulations have no less pre-emptive effect than federal statutes."
*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Conflict
preemption occurs when state law "actually conflicts" with federal law; namely, "when (a)
compliance with both state and federal law is impossible or (b) when state law stands as
an impediment to a federal purpose." *Abbot*, 844 F.2d at 1111. Thus, federal preemption
reaches beyond state laws that directly govern federally regulated conduct to facially
neutral state statutes and claims (including those sounding in contract) if the underlying
claim challenges conduct falling within the preemptive scope of federal regulation. *See
Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223 (4th Cir. 2002) (stating preemption
"turns on whether the challenged conduct in the state claim would be covered under" the
federal regulatory regime). Parties cannot avoid federal preemption "by recasting
otherwise preempted claims as state-law contract and tort claims." *Wilmington Shipping*

*Co. v. New England Life Ins. Co*., 496 F.3d 326, 341 (4th Cir. 2007). However, not all state law contract claims that overlap with federally regulated subject matter run afoul of the conflict preemption doctrine. *See In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 606, 617–19 (D.S.C. 2015) (citing *Wilmington Shipping* as support for preemption analysis in overdraft fee litigation and holding that contract claims were not preempted where they relied on theory that defendant bank's use of available balance accounting resulted in assessing overdrafts despite sufficient funds).

South State argues that Ms. Fludd's state law claims attempt to require the Bank to implement disclosures for its deposit accounts that are not required under federal law. (ECF No. 38-1 at 24.) The Bank contends that the Federal Truth in Savings Act ("TISA") and its accompanying regulations "preempt Plaintiff's attempt to use state law to force South State to adopt new or different disclosures." (*Id.* at 25.) Citing various provisions of TISA and its regulations having to do with deposit account fee disclosures, South State argues Fludd's state law claims improperly impose disclosure rules that are "inconsistent" with the requirements of TISA. (*See id.* at 25–28.) The Bank relies on *Lambert v. Navy Federal Credit Union*, Civil No. 1:19-CV-103-LO-MSN, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019), and *Cinar v. Bank of America*, No. 13–CV–3230–RWT, 2014 WL 3704280 (D. Md. July 22, 2014) as examples of cases where courts found that overdraft plaintiffs' contract claims were preempted because they challenged the adequacy of the defendant bank's fee disclosures. (*See* ECF No. 38-1 at 26–27.)

The Court finds that Ms. Fludd's state law claims are not preempted because they are genuinely premised on South State's alleged violation of its own form contract, not the adequacy of the Bank's fee disclosures. Courts have rejected defendant banks'

attempts to invoke preemption against similar contract claims in the context of overdraft fee litigation. *See, e.g.*, *In re TD Bank*, 150 F. Supp. 3d at 617–19, 621–24; *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 514–17 (D.S.C. 2014); *Coleman v. Alaska USA Fed. Credit Union*, No. 3:19-CV-0229-HRH, 2020 WL 1866261, at *7 (D. Alaska Apr. 14, 2020); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1020–26 (E.D. Ark. 2015).

In general, Ms. Fludd's claims are based on South State's practice of charging repeat NSF fees on what she alleges to be a single debit "item," namely, the same transaction that is re-presented by the merchant after having been initially returned. (*See* Am. Compl. ¶¶ 37–38.) The plaintiff in *Lambert* brought similar claims, alleging that the Navy Federal Credit Union's assessment of repeat NSF fees breached the parties' contract and the covenant of good faith and fair dealing under Virginia law, and violated North Carolina's Unfair and Deceptive Trade Practices Act. *Lambert*, 2019 WL 3843064, at *1. South State relies on a narrow holding in *Lambert* that the plaintiff's claims were preempted "[t]o the extent [he] challenge[d] a perceived failure to disclose, the specific language used in the disclosure, or the fairness of the fee practice itself[.]" *Id.* at *3. However, the *Lambert* court stated it is "well established that true breach of contract and affirmative misrepresentation claims are not federally preempted, even if the result of those claims may affect a federal [financial institution's] fee disclosures." *Id.* (collecting cases). The court further stated:

> To the extent Plaintiff's claims allege only that Navy Federal has failed to comply with the express terms of the parties' contract or affirmatively misrepresented its fee practices, Plaintiff's claims are not preempted under the affirmative misrepresentation and true breach of contract line of cases. While federal credit unions have the discretion to determine fee practices and disclosures free from state regulation inconsistent with the [Federal Credit Union Act], the TISA, and their implementing regulations, federal credit unions must still comply with the terms of their contracts related to fee

practices and not affirmatively misrepresent those practices.

*Id.* The court went on to conclude that, although the plaintiff's breach of contract claim was not entirely preempted, it was subject to dismissal under Rule 12(b)(6) because the parties' contract unambiguously gave the defendant the contractual right to impose fees in the way that it did. *Id.*

The Court finds that Ms. Fludd alleges the type of "true" breach of contract claim that is sufficient to fall on the non-preempted side of the line delineated in *Lambert*. Through its preemption argument, South State recasts Fludd's claim as a back-door effort to force the Bank to change its fee disclosures. This is simply not a fair reading of the claim as alleged. A plain reading of the claim reveals the theory of liability that South State failed to abide by the terms of its own form agreement—namely, by charging multiple fees on a single item after promising to charge a single fee per item. (*See, e.g.*, Am. Compl. ¶ 127 ("Defendant's practice violates its Account Agreement which states . . . 'We may pay all, some, or none of your overdrawn items, without notice to you. If we do not authorize and pay *an item*, then we will decline or return *the transaction* unpaid. *In either case, the insufficient funds fee* will still apply.' . . . Yet Defendant wrongfully treated each 'retry' or 'representment' of an item as a new and separate 'item' justifying additional NSF or overdraft fees in violation of the Account Agreement." (emphasis in original)).) Stated another way, Ms. Fludd's claim does not ask the Court to modify the PDAA, but only to enforce its terms.

South State also cites *Cinar* to support the contention that Fludd's claims are preempted because they are designed to force modifications to the Bank's disclosures. However, *Cinar* is inapposite. In that case, the plaintiff's claim rested solely on the theory

that the defendant bank should have disclosed a specific "Attorney Fee" in its fee schedule. *Cinar*, 2014 WL 3704280, at *1. The *Cinar* court found that while TISA and its regulations require financial institutions to maintain a schedule of fees, "'*[a] depository institution need not include in such schedule any information not specified in [the CCFB's] regulation*[,]'" including "'[i]ncidental fees, such as . . . attorneys fees[.]'" *Id.* at *3 (quoting 12 U.S.C. § 4303(a); 12 C.F.R. § 1030 Supp. I, § 1030.4(b)(4)(2)(ii) (2011)) (emphasis in original). The court concluded that the plaintiff's claim, "while framed as one for breach of contract, actually challenge[d] the adequacy of the [b]ank's disclosure of such fees," and was therefore preempted. *Id.* at *1, *3–*4. Here, Ms. Fludd does not dispute that South State disclosed the NSF fee, and the *Cinar* holding is unpersuasive to show that Fludd's claims are preempted.

Although South State focuses its preemption arguments on Ms. Fludd's breach of contract claims,[6] Plaintiffs' quasi-contractual claims are not preempted either because financial institutions, like all other entities, are "subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of" the federal law at issue. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007). The quasi-contract principles at issue here—unjust enrichment/restitution and money had and received—do not, in the abstract, conflict with TISA or its implementing

---

[6] The Bank's preemption arguments are equally unavailing as to Ms. Fludd's breach of the implied covenant of good faith and fair dealing claim as they are to her breach of contract claim. *See In re TD Bank*, 150 F. Supp. 3d at 610 (holding claim for breach of the implied covenant of good faith and fair dealing premised on defendant bank's available balance accounting in overdraft litigation was not preempted because the impact of the claim on the bank's federally authorized powers was only incidental); *Gebhard v. Bank of Am., N.A.*, No. 2:09-CV-03159-GEB-JFM, 2010 WL 580995, at *4–*6 (E.D. Cal. Feb. 11, 2010) (holding, where plaintiffs alleged their lender violated the Truth in Lending Act and Real Estate Settlement Procedures Act, that preemption did not apply because an alleged breach of the implied covenant of good faith and fair dealing is a claim of "general applicability" that does not target banks or lending activity).

regulations. Instead, they merely provide generally applicable, equitable rules for making parties whole where contract law may otherwise fail. *See Nossen v. Hoy*, 750 F. Supp. 740, 744 (E.D. Va. 1990) ("[A] quasi-contract is not a contract at all but rather an equitable remedy thrust upon the recipient of a benefit under conditions where that receipt amounts to unjust enrichment."). Nor does the substance of Plaintiffs' quasi-contractual claims present an actual conflict with the federal regulations cited by South State; the claims simply reflect another application of state law to Plaintiffs' relationship with the Bank, an application which is not impinged by federal concerns. *See Noe v. City Nat'l Bank of W. Virginia*, No. 3:19-CV-0690, 2020 WL 836871, at *5 (S.D.W. Va. Feb. 19, 2020) (holding that breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and unfair and deceptive acts claims were not preempted in a repeat NSF fee case), *vacated and remanded on other grounds*, 828 F. App'x 163 (4th Cir. 2020) (finding district court erred by failing to determine the arbitrability of the dispute before ruling on defendant bank's motion to dismiss); *Coleman*, 2020 WL 1866261, at *7 (holding, *inter alia*, unjust enrichment claim in repeat NSF case was not based on a failure to disclose and was, therefore, not preempted).

In summary, South State has not shown that Plaintiffs' state law claims are inconsistent with TISA's requirements, or that Plaintiffs are attempting to enforce new overdraft disclosure rules through those claims. Accordingly, conflict preemption does not apply here because the Bank has not demonstrated that Plaintiffs' claims render "compliance with both federal and state regulations . . . a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963), or "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

### B. Failure to State a Claim

#### i. Breach of Contract

South State asserts that Ms. Fludd's breach of contract claim fails because the PDAA discloses the fees charged in this case. (ECF No. 38-1 at 28.) "The elements for a breach of contract are the existence of a contract, its breach, and damages caused by such breach." *Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC*, 780 S.E.2d 263, 272 (S.C. Ct. App. 2015). The Bank argues that Fludd cannot show an actual breach of the parties' agreement because a previously-returned transaction, when presented for payment again, is a new "item" under the PDAA, and because the PDAA places the risk of merchants submitting multiple automated clearing house ("ACH") packets for payment on the account holder. (ECF No. 38-1 at 29–34.)

At bottom, the parties' dispute over repeat NSF fees boils down to their respective interpretations of the word "item" as it is used in the PDAA. While it is a question of law for the court to determine whether a contract's language is susceptible to more than one meaning, where a contract's material terms are ambiguous, their meaning becomes a question of fact unsuitable for a motion to dismiss. *See Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878–79 (S.C. Ct. App. 1997) ("A contract is ambiguous when the terms of the contract are inconsistent on their face, or are reasonably susceptible of more than one interpretation. . . . It is a question of law for the court whether the language of a contract is ambiguous. Once the court decides that the language is ambiguous, . . . [t]he determination of the parties' intent is then a question of fact for the jury." (internal citations omitted)).

23

South State points to certain language in the PDAA in the effort to substantiate its view that an "item" is any presentment for payment against a customer's account, including re-presentments of the same underlying transaction (ECF No. 38-1 at 31): "Debits include *items* such as withdrawals, transfers, payments, checks, debit card transactions, and fees." (ECF No. 1-1 at 12); "Examples of the *items* we will pay are checks you have written to other parties, checks cashed at a teller window, automatic drafts, bill payments, one-time transfers and other ACH *items* you have authorized." (*Id.* at 13 (emphasis added)). Ms. Fludd points to other language in the PDAA in order to show that the contract envisions only a single "fee" being charged per "item" (ECF No. 39 at 24–25): "We may pay all, some or none of your overdrawn items, without notice to you. If we do not authorize and pay an *item* then we will decline or return the transaction unpaid. In either case, the insufficient funds *fee* will still apply." (ECF No. 1-1 at 13 (emphasis added)). She then asserts that an "item" means an account holder's instruction for payment and that a single transaction cannot be turned into multiple "items" merely by being presented multiple times. (*See* ECF No. 39 at 25–26.)

The only thing that is abundantly clear about this dispute regarding whether the re-presentment of a previously-returned transaction constitutes a new "item" is that the PDAA itself does not explicitly resolve it. (*See generally* ECF No. 1-1.) This Court joins other courts that have found the definition of "item" in a deposit account agreement to be ambiguous under materially similar circumstances:

> In short, the definition of "item" is ambiguous with regard to whether a resubmission of an ACH transaction is a separate item or is part of the same initial ACH transaction, and that ambiguity must be read in favor of Plaintiffs at this stage. Because Plaintiffs' proposed construction is a reasonable construction of the Agreement, Plaintiffs have sufficiently alleged a breach resulting from multiple overdraft charges imposed as a result of

resubmissions of a single ACH transaction.

*Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 640 (S.D.N.Y. 2020). Because the parties'

respective interpretations of the controlling contractual term are both reasonable, Ms.

Fludd's breach of contract claim reveals a material ambiguity in the PDAA that is directly

tied to the challenged imposition of overdraft fees. The resulting question of fact as to the

ultimate meaning of "item" must be resolved by the fact finder after discovery, and the

motion to dismiss for failure to state a breach of contract claim is denied.

### ii. Breach of Implied Covenant of Good Faith and Fair Dealing

South State contends that Ms. Fludd's claim for breach of the implied covenant of

good faith and fair dealing fails as a matter of law because South Carolina does not

recognize a stand-alone claim for breach of the implied covenant outside of a breach of

contract claim. (ECF No. 38-1 at 34 (citing *Carpenter v. Measter*, No. 2013-UP-066, 2013

WL 8482282, at *2 (S.C. Ct. App. Feb. 6, 2013)).) There exists within every contract an

implied covenant of good faith and fair dealing. *See, e.g.*, *Parker v. Byrd*, 420 S.E.2d 850,

853 (S.C. 1992). The United States Supreme Court offered helpful insight into the

vagaries of this doctrine in the case of *Northwest, Inc. v. Ginsberg*, 572 U.S. 273 (2014):

> While most States recognize some form of the good faith and fair dealing doctrine, it does not appear that there is any uniform understanding of the doctrine's precise meaning. "[T]he concept of good faith in the performance of contracts 'is a phrase without general meaning (or meanings) of its own.'" *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (C.A.D.C. 1984) (Scalia, J.) (quoting Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L.Rev. 195, 201 (1968)); *see also* Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L.Rev. 369, 371 (1980). Of particular importance here, while some States are said to use the doctrine "to effectuate the intentions of parties or to protect their reasonable expectations," *ibid.*, other States clearly employ the doctrine to ensure that a party does not "'violate community standards of decency, fairness, or reasonableness.'"

*Id.* at 285–86 (citing *Universal Drilling Co., LLC v. R & R Rig Service*, LLC, 271 P.3d 987, 999 (Wisc. 2012); *DDP Roofing Services, Inc. v. Indian River School Dist.*, 2010 WL 4657161, at *3 (Del. Super. Ct., Nov. 16, 2010); *Allworth v. Howard Univ.*, 890 A.2d 194, 201-202 (D.C. 2006); *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assocs.*, 864 A.2d 387, 395–96 (N.J. 2005); *Harper v. Healthsource New Hampshire*, 674 A.2d 962, 965–66 (N.H. 1996); *Borys v. Josada Builders, Inc.*, 441 N.E.2d 1263, 1265–66 (Ill. 1982); Restatement (Second) of Contracts § 205, Comment a (1979); Summers, The General Duty of Good Faith—Its Recognition and Conceptualization, 67 Cornell L.Rev. 810, 812 (1982)). Some states, including South Carolina, maintain that the implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim for breach of contract. *See, e.g., RoTec Servs., Inc. v. Encompass Servs., Inc.*, 597 S.E.2d 881, 884 (S.C. 2004). Thus, while South Carolina law recognizes the implied covenant, it maintains that the implied covenant should be viewed "as merely another term of the contract at issue." *Id.* at 884 (internal citation omitted).

The Court finds that Ms. Fludd has pled sufficient facts to state a plausible claim for relief under the implied covenant of good faith and fair dealing, and declines to dismiss her claim under Rule 12(b)(6). Simply put, Fludd contends that South State has not adhered to the duty of good faith that arises from the implied covenant when assessing NSF and overdraft fees. (Am. Compl. ¶¶ 132–38.) In asserting this claim, Fludd seeks to enforce South State's obligation to carry out its contractual duties in good faith, pursuant to the purpose of the PDAA. In other words, even if South State complied with the literal terms of the PDAA, an assumption which Ms. Fludd disputes, a plausible claim remains that South State imposed NSF fees in an abusive manner, or that "the Bank's actions

26

violated the implied covenant where they were in excess of the express terms to the plaintiffs['] detriment." *In re TD Bank*, 150 F. Supp. 3d at 627 (citation omitted). For example, Ms. Fludd seeks to show that South State established its polices to incentivize rejecting the payment of items in the first instance. The alleged financial incentive for this is apparent: paying a transaction directly into overdraft triggers a single fee, while returning the same transaction unpaid could yield additional fees upon re-presentment. To the extent she can show that South State's overdraft policies were about maximizing revenue, Fludd will claim that the policies were motivated by bad faith. (Am. Compl. ¶ 137.) It is of no moment that the *form* of Ms. Fludd's claim for breach of the implied covenant is set forth in a separate count of the amended complaint. (*See id.* ¶¶ 132–38.) The fact remains that the *substance* of this claim is premised upon South State's execution of its contractual obligations, and therefore inextricably tied to her breach of contract claim. (*See id.*) Accordingly, Ms. Fludd has stated a plausible claim for relief pursuant to the implied covenant of good faith and fair dealing, and the motion to dismiss this claim is denied.

### iii. Unjust Enrichment/Restitution, Money Had and Received

Finally, South State asserts that Plaintiffs' claims for unjust enrichment/restitution and for money had and received are covered by the express terms of a contract, and are, therefore, barred under South Carolina law. (ECF No. 38-1 at 34–35.) The Bank argues that the PDAA and Opt-in Agreement governed all obligations owed to Plaintiffs by South State during the relevant time periods, and that because these express contracts governed the parties' business relationships, the Quasi-Contractual Claims must be dismissed. (*Id.*)

The Court finds that Plaintiffs' equitable claims are not subject to dismissal because the federal rules allow claimants to plead alternative and even contradictory claims. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Federal courts that have considered the question of whether unjust enrichment claims may coexist with contract claims in the context of overdraft litigation have declined to dismiss the equitable claims merely because a contract governed the parties' relationship. *See, e.g.*, *In re TD Bank*, 150 F. Supp. 3d at 632 (declining to dismiss unjust enrichment claims despite overlap with contract claims, particularly where plaintiffs' theory of the case was that the "overdraft fee policy *in practice* exceeded the bounds of what the express terms of a contract allowed" (emphasis in original), and thus could potentially be an alternative theory of relief if the contract claims failed); *but see, e.g.*, *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 53–54 (E.D.N.Y.) (applying New York and California law and dismissing the unjust enrichment claim because "a plaintiff would not be required to elect his or her remedies only where, unlike here, there is a bona fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue" (citation and quotation marks omitted)). After careful consideration, the Court concludes that Plaintiffs' equitable claims should be permitted to proceed as an alternate theory of liability at this early stage of the litigation and the motion to dismiss on this basis is denied.[7]

---

[7] It is also worth noting that Ms. Butcher does not bring any contract claims.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant South State Bank's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) (ECF No. 38) is DENIED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

October 6, 2021
Charleston, South Carolina

29